# CHARLESTON.

DAVIS *v.* SETTLE *et al.*

(BRANNON, JUDGE, *dissenting*).

Submitted September 17, 1896—Decided December 19, 1896.

1. CONSTRUCTIVE TRUSTS—*Adverse Possession—Trustees.*

Where a person having an inequitable paper title to a tract of land, and out of possession thereof, with full knowledge of another's superior equitable title, by any means obtains the superior legal title, which rightfully belongs to the holder of the equitable title, and possession thereunder, so as to prevent the rightful acquirement thereof by the holder of the equitable title, and thus bars his suit at law for the possession of the land, equity will hold such person a trustee of the legal

title for the benefit of such holder of the equitable title; the acquirement of the legal title under such circumstances being regarded as constructively fraudulent.   (p. 22.)

2.  CONSTRUCTIVE TRUSTS—*Quieting Title—Trustees.*

Where a holder of the equitable title to a tract of land has the right to have his deed reformed by his remote grantors, so as to cover such tract of land, and others claiming adverse inequitable title to the same land from the same grantors, with full knowledge of the outstanding equity, by judicious management contrive, in fraud of the rights of the equitable holder, to perfect their inequitable title in such way as to prevent the correction of such deed in such manner by their common grantor, such others will be held as trustees of the legal title, and compelled to convey the same to the holder of the equitable title.   (p. 23.)

3.  CO-TENANCY—*Seisin.*

Common seisin in fact or law, without regard to source of title, creates co-tenancy.   (p. 24.)

4.  CO-TENANCY—*Co-Tenancy Possession—Adverse Possession,*

Where a person claiming an inferior paper title to land held by co-tenants under a superior possessory title obtains possession of the land by any device from the co-tenant in actual occupancy thereof, without the knowledge of the other co-tenants, his entry will be held to have been under the co-tenancy possession, and not under his adverse paper title, and to so continue until perfect dissesin of the other co-tenants, either presumed from lapse of time or some notorious act of adversary possession, or dissesin brought home to the knowledge of the other co-tenants.   The burden of establishing such perfect disseisin is on the person alleging it.   (p. 28.)

5.  EQUITY JURISDICTION—*Partition—Quieting Title.*

Section 1, chapter 79, Code 1891, authorizes a court of equity in partition cases to pass on all questions of law touching the legal title of any one claiming to share in the partition to the interest he claims, if his interest be such as, if valid, will make him a co-owner in the common subject with the plaintiff as holding under the same right or title under which the partition is to be made; but it does not authorize the court to pass on the title of a stranger claiming under a different title, adverse to the title under which the partition is to be made; nor can such stranger and his hostile title be brought into such suit, and the conflict between the two hostile rights settled as incident to partition.   (p. 30.)

6.  EQUITY JURISDICTION—*Trial by Jury—Constitutional Law.*

In matters of such nature as give right to trial by jury under the Constitution, the legislature cannot give equity jurisdiction over them, and deprive the party of right of trial by jury against his protest.   (p. 32.)

7. EQUITY JURISDICTION—*Trial by Jury—Constitutional Law.*
   Where already, at the time of the adoption of the Constitution, equity exercised jurisdiction in a certain matter, the provision of the Constitution guaranteeing trial by jury does not relate to or give right to trial by jury in suits in equity involving such matter. (p. 34.)

8. EQUITY JURISDICTION—*Quieting Title—Possession.*
   Equity has no jurisdiction, upon the sole ground of removal of cloud from title, to try conflicting titles to lands, at the suit of one holding either legal or equitable title, the adverse claimant being in actual possession. (p. 36.)

9. CHAMPERTY.
   Where a contract is affected with champerty, only the party to it, and not a stranger, can make that defense against it. (pp. 25, 40.)

10. DEPOSITIONS—*Notice—Defective Notice.*
    A notice to take depositions is not bad because it specifies the county in which the depositions are to be taken, or in which the suit is pending, but does not specify the state. (p. 42.)

Appeal from Circuit Court, Fayette county.

Bill by James W. Davis against H. M. Settle, the Rush Run Coal & Coke Company, and others for partition, and to determine complainant's rights in land. From a decree for plaintiff, the defendant coke company appeals, and certain of the appellees cross-assign errors.

*Reversed in part, and modified.*

ST. CLAIR & GAINES and BROWN, JACKSON & KNIGHT, for appellant.

J. W. DAVIS, L. L. LEWIS, J. W. HARRIS, and R. F. DENNIS, for appellees.

DENT, JUDGE:

This is a chancery suit, instituted by James W. Davis against H. M. Settle *et al*, in the Circuit Court of Fayette county. The facts of the case are as follows: Both parties claim under Sarah Stuart. In September, 1837, Seth Huse purchased from Sarah Stuart, by written agreement, out of a large tract "fifty acres of land, on New river, including the upper improvement, that John Scott has in possession." Huse sold Settle this fifty acres in 1845 by writing, providing that, when the purchase money should be paid, Huse should convey or cause to be conveyed, to Settle. The agreement between Huse and Stuart was a

mere executory agreement, not under seal, and provided that Huse might take in more land at fifty cents per acre. Sarah Stuart, by will devised her lands to her children, and empowered Samuel Price, her executor, "to convey any lands that may be sold at the time of my death." The lands were partitioned, and a five thousand eighty-three and a half acre tract was assigned to Agnes Peyton, in which was included the "Harrison Settle fifty acres," on New river, so marked on the plat of partition. Agnes Peyton and her trustees sold and conveyed this land, according to the plat, to A. A. Low, April 22, 1874, excluding on the face of the deed the Harrison Settle fifty acres. Huse and Harrison Settle had been in actual possession of the land since the year 1837, and Settle was in possession thereof at the time Low purchased and continued thereon until a short time before the institution of this suit. April 3, 1874, Samuel Price, as empowered by the will of Sarah Stuart, executed a deed to Settle for fifty acres, by metes and bounds, but which did not include the thirty acres now in controvesry, and which Settle was then in possession of, as the Huse land. The deed was not delivered to Settle until March 5, 1878, when Husé gave it to him, taking his receipt therefor on his bond, in words as follows: "Rec'd of Harlow Huse, Samuel Price's executor's deed for the within-described land, this 5th March, 1878." It was recorded March 28, 1878. Afterwards, when Low claimed the land in controversy as not covered by Settle's deed, Settle refused to give it up, and claimed the boundaries of the deed were wrong, and that he was entitled to the land, as shown on the partition map, as bounded by New river, and of which he had been in possession. Low brought an ejectment suit against him, and the plaintiff, Davis, agreed to defend suit and pay the costs, in consideration of one-half the recovery. This agreement was reduced to writing, and duly recorded, as required by law. The suit was twice tried and each time resulted in a verdict in favor of Low. Settle appealed, and this Court reversed the case both times; the last time holding that Low's deed did not cover the disputed land, and that Samuel Price's deed was void, in so far as it conveyed other land to Settle in lieu of that in suit, thus virtually determining the case against Low.    9

S. E. 922. In the meantime, Low had leased his land, or a part thereof, including the disputed tract to the defendant, the Rush Run Coal Company. Settle was still in adverse possession thereof. On the 3rd day of September, 1888, the Rush Run Coal & Coke Company, Low's tenant, with full notice of Davis' claim to half this land, both actual and constructive, obtained from Harrison Settle a deed purporting to convey to it the fifty acres deeded to him by Samuel Price, including within its boundaries the part thereof that had been disclaimed by Settle in the case of Low against him, and containing this recital: "It being the intention of the party of the first part to convey only such land as he now owns on the south side of the river within the lands of A. A. Low." Having thus parted with his whole interest, he surrendered possession of the land in controversy, and the Rush Run Coal & Coke Company took possession thereof, as they now claim, as the tenant of A. A. Low. Low, having thus obtained possession of the land through his tenant, dismissed his action. Plaintiff, learning of this, and on the 30th day of September, 1889, having obtained a deed according to his title bond, instituted this suit to know just how he stood, and have partition of the land between himself and the person appearing entitled thereto.

In the suit of A. A. Low against Settle, this Court held that Samuel Price had erroneously executed his power as executor of the will of Sarah Stuart. Such being the case, having once executed the power, though erroneously, he never could correct it, as the deed had been delivered, and admitted to record, and the only way his mistake could be corrected was by the interference of a court of equity, and then only as against those having full notice thereof. When the deed passed out of his hands into the hands of Settle, Low already had his deed, and he knew just where the Huse land lay, that Settle had in actual possession. Hence he made his purchase with full knowledge of Settle's rights as to said land, but when he discovered afterwards that the Price deed did not cover the land in controversey, in February 1881, he began his ejectment proceedings. Settle, being in full possession of the land at this time, and until he surrendered possession, had the right to file his bill in equity to reform his deed in accord-

ance with his possession, and prevent Low's deed from becoming a cloud thereon. It is conceded that the land included in the Price deed and that in controversey unquestionably belonged to Low and Settle, and no others were interested therein. Now the only other persons interested are the Rush Run Coal & Coke Company and the plaintiff, Davis. And there can be no question that Settle has no longer any interest in this controversey, for, when he made the deed to the Rush Run Coal & Coke Company, it is plain from the deed that he intended to sell only and all lands owned by him within the boundary covered by Low's lands. The word "only" was used, not only to show that he did not intend to convey the lands formerly disclaimed by him within the boundary, but as a reservation of the Davis interest, and also to indicate that he parted with his possessory title under the Huse purchase, including all interest, of every kind and character, within the Low boundary. It is plain to be seen that the object of this purchase was not the fifty acres covered by the Price deed, so much as it was to obtain the possessory title of Settle in the Huse land, and thus divest Davis of any title thereto except equitable, and prevent him holding the same against Low, compelling him to sue at law, and then defeat him by a complete chain of title on Low's part and a want of title on his part. Both Low and the Rush Run Coal & Coke Company had constructive and actual notice of Davis' rights. In 1 Perry, Trusts, § 223, the law is stated: "If in any way a person purchases with what the law construes to be full notice that another has a legal or equitable title to the property, or that he has been deprived of his interest by accident, mistake, or fraud, he will be held as a trustee." The Rush Run Coal & Coke Company is the tenant of Low, and all its purchases of outstanding title to Low's land inure to the latter's benefit, with or without the consent of such tenant, while the tenancy continues. Settle's equity to the land in controversy was superior to Low's, also was Davis' equity, he having acquired from Settle. Settle's possessory title was also superior to Low's, but Low's tenant, who must be considered Low's agent for the purpose, obtained Settle's possessory title, to the benefit of which Davis was entitled, of which Low had full notice, by purchasing all of Settle's

interest as aforesaid. Hence both the agent and principal should be held as trustees of such possessory title for the benefit of the plaintiff, whom they have defrauded by purchase from Settle. It is true the tenant did not effect the transfer of the possessory title by the open and direct purchase thereof, but accomplished its purpose just as effectively by the indirect purchase, so that it concealed its object, that every one that runs might not read. Together the landlord and tenant have managed to outwit justice so far as a legal forum is concerned, for they have the necessary title papers to cover the land. The landlord can say, "I have title to the whole land, except Harrison Settle's 50 acres, excluded in my deed." The tenant can say, "I have a deed from Harrison Settle for his 50 acres." Both titles are complete. Is not this a plain case for the interference of a court of equity, especially when its purpose is to circumvent the adjudications of such court, and defeat what it has determined to be justice?

There is still a further ground for equitable interposition. When Davis acquired his right from Settle, he acquired along with it the right to have the Price deed so reformed as to cover the land in dispute, to at least the extent of his moiety thereof, except as against purchasers for value, without notice. The tenant, by its deed, has acquired thirty acres of land, which properly belonged to Low, and which Settle disclaimed, and has never owned, though the legal title was in him by clear misunderstanding. Settle wanted to surrender this land, and hold the thirty acres, which rightly belonged to him. But Low wanted to make the trade because the Huse thirty acres was the more desirable. Now, the tenant having purchased with full notice of the rights of Settle and Davis, although it has acquired the right, if acting in good faith, to have the Price deed reformed so as to cover the Huse thirty acres, but as it has leased from Low this same thirty acres (on what terms is not disclosed), it is willing to yield its rights if not legally compelled to, and let Low hold the same under his deed. Thus are they together in possession of the land to which plaintiff is entitled, with title papers fully covering the same, while the plaintiff has a superior equitable title, of which they

had full notice when they acquired complete legal title thereto; hence they must be held as trustees in so far as plaintiff's rights are concerned. By their conjunctive acts, the defendants have debarred the plaintiff from seeking relief from the representatives of Mrs. Stuart's estate, and equity will require them to grant him the relief which but for their collusion he might have had from others. By the adverse decision by this Court as to Low's deed, covering the land in controversy, which was a virtual determination of the suit, although still pending, the statutory bar of ten years rendered Settle's adverse possessory title indefeasible. The pendency of such suit only stayed the running of the statute as to such suit, and not as to any other proceedings. And on its dismissal by the plaintiff Low therein, in so far as the plaintiff Davis is concerned, it must be considered as though it had never been brought; thus leaving the landlord, by reason of the purchase thereof by his tenant, in full investment of Settle's indefeasible title, subject to Davis' equitable rights therein.

Equity jurisdiction is so plain on the grounds aforesaid that it is hardly necessary to discuss the question of possession. But even on this question, from the pleadings and proofs, the law is clearly with the plaintiff. Co-tenancy is a question of possession entirely, without regard to title. The law presumes that possession is under title papers, unless such presumption is destroyed by the facts and circumstances established to exist by the evidence. Settle owned the land in controversy by color of title, rendered indefeasible by actual adversary possession as to Low for a period of more than ten years, acquiesced in by those under whom he claimed. The purchase money was fully paid, and actual occupancy, even if the Huse title bond was indefinite, satisfied the statute of frauds, and estopped his vendors from denying his right to the land so held by him. In addition thereto, they had it platted off to him in making the partition, and under which Low purchased. For some reason not thoroughly apparent, Price made him a deed for fifty acres, including therein thirty acres of land which belonged to Mrs. Peyton (afterwards Low), and not including the land which he was actually occupying, and on which his house and improvements

were situated. It is claimed that this was done at Settle's instance. Settle never received his deed until 1878, long after Low had his deed, and had gone into possession of his land, with full notice of Settle's occupancy and claim. While he received the deed, Settle claimed that he did not know but what it covered his land; and he would not accept or take possession of the Low thirty acres, or move his buildings thereon, but positively and continuously refused to do so. Low, finding out the condition of affairs, determined to compel Settle to take his thirty acres included in the deed, in exchange for the thirty that in reality belonged to Settle. For this purpose, instead of offering to correct the mistake, or instituting a chancery suit to reform Settle's Price deed as a cloud on his title, he brought his action of ejectment. For almost ten years it was carried on, and Settle, to prevent Low from succeeding, was compelled to sell one-half of the land to the plaintiff, to enable him to defend his possession. This is called "champerty." If it is so, it is honest champerty, such as a court of equity will not avoid at the instance of the person who was the unjust cause thereof.

Champerty is a species of maintenance, and, while maintenance has not been directly abolished by statutory enactment, it has been so indirectly encroached upon as to render it almost obsolete. At common law, maintenance is said to be an officious intermedling in a suit that in no way belongs to the medler, and signifies an unlawful taking in hand, or upholding of quarrels or sides, to the disturbance or hindrance of common right. Champerty is the unlawful maintenance of a suit in consideration of a part of the matter in controversy. The reason of the law was that maintenance tended to suppress justice and truth, work delay, and stir up strife, and all maintenance of a suit by a stranger was at common law unlawful, and was considered *malum in se*, as it permitted the wealthy to oppress the poor, and rob them of their small inheritances. No mere chose in action was assignable. Now, almost any cause of action is transferable; and attorneys are permitted to take any case on a contingent fee, and nothing can be considered maintenance the end whereof is justice, but only such conduct as is malicious or oppressive in its nature. An attorney who takes advantage of the circumstances of

his client, and, under the pretence of charging him a fee, defrauds him of his property, or one who, to vent his private malice, upholds an unjust cause, in which he has no interest, would probably be regarded guilty of maintenance, and, at the instance of the client in the former case, the contract would be avoided. The right to purchase a. lawsuit is not now denied. The plaintiff would have had the right to have purchased Settle's entire interest, and to have carried on the litigation to finality for himself. Why not, then, purchase a half interest contingent on the result? This Court, at least, will not hold it to be maintenance of an unjust cause which it has already decided to be just. While the court will prevent its officers from being oppressive toward their clients, it will also protect them against the manipulations of those who seek to evade the force and effect of its decisions, and thus deprive the attorney of his earned fee. There should be honesty even among opposing litigants towards the attorneys of their opposers. Attorney's fees should not be less sacred than other obligations, and they should respect each other's rights with regard thereto. Much disrepute has been brought on the profession, not more by the charge of extortionate fees than the disposition on the part of the profession to disparage the services of other members thereof, and to lend their aid to any scheme which will enable others to prevent an attorney from reaping the reward of his labors as a punishment to him for having sustained the cause of an opposing litigant. This does not apply to the management of the present case, but to the conduct of Low and the Rush Run Coal & Coke Company when they undertook to buy out Settle,—that they did not consult his attorney of record, known to them to be personally interested in the litigation, and make their purchase complete. Had they done so, they would have probably been saved much trouble, expense, and mortification. Settle was an ignorant old man, but he knew that the law would not deprive him of the land on which he had resided for so many years. When the ejectment suit had reached such a condition, owing to the holding of this Court, that it was about to be determined against Low, his tenant, the Rush Run Coal & Coke Company, through its president, Effinger, with full notice of plaintiff's rights, as shown by the evidence of Settle,

presumably with Low's consent and knowledge, and un-
doubtedly for the benefit of the landlord, who accepted
thereof, bought out Settle's entire interest, paying, it is
true, seemingly a good price therefor, but with its eyes
open. The ejectment suit was then dismissed, because, as
the answer of Low alleges, Settle "surrendered possession
of the land," but not because of the suit. When plaintiff
filed his original bill, he did not know just how he stood,
but considered himself a co-tenant with whomsoever might
own the other half of the land,—Low, Settle, or Low's ten-
ant,—and asked for partition. The answer claimed adverse
possession under Low's deed, by virtue of possession sur-
rendered by Settle. If disseised at this time, plaintiff did
not know it, and hence the disseisin was not perfect. For
the following reason, when Settle sold and surrendered
possession, it was the joint possession of himself and plain-
tiff in co-tenancy, so that Low and his tenant entered into
that possession, and became co-tenants with plaintiff.
When a person accepts the results, he also adopts the means
by which they are attained. Low attempts, in after plead-
ings, to escape the effects of his admission in his first
answer, by claiming that Settle merely abandoned posses-
sion, and he entered under his deed. The transaction is
too plain to justify any such evasion. The tenant took the
possession, and not Low, although for his benefit, and took it
direct from Settle. In his first amended bill, plaintiff is still
in doubt as to his proper standing, and calls on the defend-
ants for information as to their claims, and finally, in his
second amended bill, not appreciating or understanding
his true position, charges the defendants with being in
forcible possession of the land. They, of course, claim ad-
verse possession under adverse title. This Court, having
decided, between the same parties or privies, that Low's
deed did not cover this land, will not now permit such de-
cision to be avoided by the act of one of the parties
thereto, nor permit Low to claim possession under such
deed. *Poole* v. *Dilworth*, 26 W. Va. 583.

Settle, when he sold, had possession under adverse pos-
sessory title superior to Low's paper title. When the ten-
ant entered by reason of its purchase in behalf of its
landlord, it entered into the possession of Settle under his
possessory title; and thereby both the tenant and landlord,

as to such possession, became co-tenants with plaintiff. And the possessory title, while ordinarily it would be merged into the paper title of those in possession, will not be so done to the injury of one entitled to the benefit thereof, nor in avoidance of an adjudication of this Court. A person out of possession, holding an inferior paper title, cannot buy out a co-tenant in actual possession to the detriment of the other co-tenants, and then claim to enter under his inferior title adversely to them; but he will be held to have entered into and hold under the co-tenancy possession, until actual perfect disseisin of them, by presumption from lapse of time, or as is said in the case of *Pillow* v. *Improvement Co.* (Va.) 23 S. E. 32, by "a clear, positive, and continued disclaimer of title and adverse right, brought home to the knowledge of the other co-parceners." In that case it was held that, to make constructive possession under an adverse title amount to perfect disseisin in favor of those entering under the co-tenancy possession, it must have continued the statutory period of ten years. It is different, however, if the possession is not under the co-tenancy, but is entirely independent thereof. Every presumption is in favor of the co-tenancy if it once existed, and it devolves on him alleging to prove perfect disseisin, or nonentry under such possession. It has not been done in this case, as no actual knowledge of or claim of disseisin was brought home to the plaintiff until after the institution of his suit. A co-parcener cannot be disseised without his knowing it until lapse of time raises a presumption against him which he is unable to explain or rebut; so that the tenant and landlord together must be regarded as the co-tenants of the plaintiff, for they have failed to establish perfect disseisin. Nor do they claim to be purchasers for value without notice, but, with full knowledge, they took the risk of plaintiff's claim, and entered on the land, and improved the same. They, therefore, cannot be protected as innocent purchasers for value, without notice, although they may have sincerely believed that they would be able to defeat the plaintiff of his right to recover in any suit instituted by him. For this reason, they are not entitled to any allowance for their improvements. Settle has no interest in this land or controversy, having parted with the same to the Rush Run Coal & Coke Company, and its land-

lord, Low; and the circuit court erred in decreeing in his
favor. His half of the land should have been allotted to
his vendee and its beneficiary, as parties in co-interest in
this controversy. According to the pleadings, he has the
fee, and it is the lease or possession which belongs to both.
This is a matter between them, as their interests in this
suit and the land appear to be mutual and identical.
As these are the only questions involved in the rehearing,
reference is made to the opinion of Judge BRANNON, where
all other questions are fully discussed and determined.
This opinion, being written concerning points only about
which the court disagree, is not intended to cover the
whole case.

The decree will be reversed in so far as it adjudges Har-
rison Settle one-half the land in controversy, and amended
so as to allot the same to the heirs of A. A. Low and the
Rush Run Coal & Coke Company, and in all other respects
affirmed, with costs to the appellee Davis, as the party
substantially prevailing.

BRANNON, JUDGE, *dissenting*:

The first point made by appellant's counsel is that equity
has no jurisdiction, as the claim of Davis to the land and
that of Low and the coal company are adversary and hostile
to each other, not in privity, and that, where such is the
case, even in cases of partition chancery has no jurisdic-
tion; that before the passage of section 1, chapter 124,
Code 1849, as established in such cases as *Straughan* v.
*Wright*, 4 Rand. 495, equity could not grant partition where
the legal title was not clear and conceded; and that that stat-
ute did not so far modify that rule as to allow under the guise
of a bill for partition, a suit in equity to try adverse titles,
but only in cases where the controversy was limited to the
parties claiming as joint tenants, tenants in common, or
co-parceners, and concerning only the common title under
which all held; and upon this question the brief of counsel
for appellant contains an able and valuable collation and
discussion of Virginia and West Virginia cases.

Up to the enactment of the Virginia Code of 1849, it was
settled law that partition was a matter of right in equity,
if the plaintiff's title was admitted or clear; but if de-
nied, or dependent on doubtful questions of law or fact,

equity would either dismiss the case, or suspend action until the parties should, by proper action at law, test the legal title. This was because the law court was the proper forum to try, by jury, title to land. But the Code of 1849, in section 1, chapter 124, provided that courts of equity might take jurisdiction in partition, and, in its exercise, "take cognizance of all questions of law affecting the legal title that may arise in any proceeding." Such is our Code, in section 1, chapter 79. All concede that this legislation wrought a change, but how far is the question. Broad as is this language, and broad as is the language of the syllabus in *Moore* v. *Harper*, 27 W. Va. 362, that in partition cognizance may be taken by courts of equity of "all questions of law affecting the legal title that may arise in the proceeding, such as removing a cloud from the title, or passing upon an adverse claim," I am not of opinion that either means to transfer from the law court into equity the title of a total stranger to the party asking partition,—a title foreign and hostile to the title under which the plaintiff claims; a different title. For instance, a number of heirs of a dead man, suing for partition of his lands among themselves, could not bring into that suit one not an heir, nor claiming the share of an heir, but claiming a title distinct from that of their father, and hostile to it, because it covered a part or all of their land. I can see that it would be desirable to do so, for the reason that, if they have partition without settling that adverse claim, it may be found years later to be valid, and take the land of one of the parceners, and that parcener would have to ask the others to give him land to make up his lost share, when that could not be done, because of sales to *bona fide* purchasers for value. Still, I have no idea that these parceners can bring this stranger into their partition suit, and there try his title, because there is no privity, but only hostility, between them, and it would make the suit multifarious, as bringing into their suit a man and matter distinct from their rights as among themselves involved in the suit. Worse still, it would deprive that man of his constitutional right to have his freehold estate in land tried by a jury. I see that in laying down broadly the power of equity in partition cases to pass on questions of title under the statute, in *Hudson* v. *Putney*, 14 W. Va. 561, the Court

says that courts of equity must observe the general rules of practice in equity for the purpose of ascertaining facts by a jury or otherwise, as may be most proper, thus contemplating a jury trial on the question of title; and, if I could see that a court of equity possessed power to have a jury in such a case, I might be more inclined to give the statute so broad a construction, though still I would not think it was intended to bring into a suit for partition adverse titles held by total strangers. But I find that Code c, 131 s. 4, prohibits a chancery court from directing an issue except where there is conflict in evidence; and section 5 of chapter 131, giving power to a court to have an issue tried or an inquiry of damages made by a jury, is in words limited to law cases, and section 8, chapter 121, is confined to motions; and I know of no statute authorizing such a land trial by jury in equity. Could it, however, direct an issue on the title, as under old practice it has done where there is conflict of evidence? I am doubtful as to this. So I do not think the stranger's adverse title can be brought into a suit in equity for partition. But the statute made some change, as all concede. What change? Just enough to enable courts of equity, in proper partition cases, to do what they could not do before the statute; that is, pass on the legal right of any one claiming participation in the common subject, and, in doing so, to inquire into all questions touching his legal title to the share claimed by him,—to inquire into that claim or title which, if valid, would entitle him to share in the farm; not to examine title of a stranger who could not come into the partition, even though his title be found valid. The person thus brought in, and compelled to submit his title to equity hearing, must be one having himself a share in the farm, or some one claiming under one who had a share with the plaintiff. In other words, the suit must be a suit for partition of the farm among those who own it,—a partition suit; and in it the court can determine all manner of questions bearing on the right of the parties claiming under the same title to shares in it. One of the several co-parceners may have sold his share to several contesting parties. He may have had it sold from him by creditors. In many ways there may be contesting claims as to his interest, depending on doubtful questions

of law and fact. The question arises, to whom shall that share be allotted? Before the act, chancery could not go on with the case, and the parties had to go into a law court to test the matter of who is entitled to that share; but, under the act, equity can now do this. That was the lameness in equity which the statute was aimed to cure,—the evil to be remedied. Never was it designed to make an ejectment out of a partition suit to the extent of trying separate titles, without relation or kinship to each other. If a cloud, by adverse title, hangs over the common property, which may, after partition, take the share allotted to one, and disarrange the partition, the joint owners must be prudent to sue their adversary, and settle his title before making partition; for they have no right to bring him into chancery, and rob him of trial by jury, in violation of that provision of *Magna Charta* incorporated in our bill of rights: "In suits at common law, where the value in controversy exceeds twenty dollars, exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved." Const. art. III, Sec. 13. Such is the construction of this statute in Virginia given, without discussion, in the late case of *Pillow* v. *Improvement Co.*, (Va.) 23 S. E. 32, holding that defendant cannot defeat plaintiff's right to have his legal right settled in a suit for partition by merely denying plaintiff's right to partition, and holding adversely to him, where defendant's grantor was a co-parcener with the plaintiff. But that case repudiates the broader construction that anybody holding any adversary title may be forced to submit his right to adjudication in equity.

Even under the construction of the statute here given, it may be said, not without some force, that the said clause of the constitution is broken when we bring into equity a party, and try his legal right to a share in the farm by a chancellor, instead of a jury, although he did derive his right from one who claimed that share as co-parcener. He says he claims a freehold estate in land, and if there is any instance where, next to a trial of life or liberty, a man is entitled to a jury, it is where one is to be deprived of his land,—his home. Confessedly, before the statute, equity could not try his title. He could be deprived of his freehold only by a judgment of his peers;

and can the legislature, by thus widening the jurisdiction of equity, and enabling it to try without jury what before it could not, take from him his right to a jury? In *Tillmes* v. *Marsh*, 67 Pa. St. 508, it is asserted that an act of assembly transferring any part of the jurisdiction of the common-law courts to a court of chancery would be unconstitutional. *Coal Co.* v. *Snowden*, 42 Pa. St. 488, holds that jurisdiction in equity cannot, under statutory amendments or proceedings, be extended by legislation to embrace matters which, at the adoption of the constitution, were common-law rights, and within the exclusive jurisdiction of common-law courts, so as to cut off trial by jury. See that case in 82 Am. Dec. 530, and note. In *Tabor* v *Cook*, 15 Mich. 322, it is held that an act giving right to file a bill to quiet title would be unconstitutional as applied to one in possession; that as, in civil cases at law, provision was made for jury trial, but none in chancery, except in special cases of issues out of chancery, merely to satisfy and guide the conscience of the court, a provision for trial of a case in the nature of ejectment, without provisions for a jury, would be void. This doctrine is clearly asserted in *Donahue* v. *Meister*, 88 Cal. 121, (25 Pac. 1096). See *Appeal of Frisbee*, 88 Pa. St. 144; *Appeal of Barclay*, 93. Pa. St. 50. This principle seems plain, the difficulty lying in its application. It is not so easy to see that the statute, even under the limited construction here given it, is not repugnant to the constitution, because, if we give it any effect, it must bring to trial by the chancellor alone rights which before its passage were only triable at law. But we must not hold an act unconstitutional unless it is so plainly so that no escape is left. The Virginia supreme court, in *Pillow* v. *Improvement Co.*, 23 S. E. 32, has held the statute, so construed, constitutional.

The well settled principal is that as equity proceeds without jury, where any subject was within its jurisdiction at the time of the adoption of the constitution giving jury right, the guaranty of jury trial in the constitution will not apply to equity cases. To do this would emasculate the vigor and utility of equity jurisdiction. The makers of the constitution, well aware that equity exercised an immense jurisdiction without jury, not only did not

abolish it, or provide for jury trials in such courts, but expressly retained such courts, with plain intent that they should go on wielding their powers according to the practice of centuries, without jury trial. In the clause guarantying jury trial, they used the limiting words "in suits at common-law." This does not mean that a matter in which right to the jury had existed before the constitution may, by legislation, be transferred to a court of equity, and the party deprived of a jury, merely because it does not arise in an action at law, but it refers to matters before the constitution triable by jury. Opinion in *Barlow* v. *Daniels*, 25 W. Va. 512. But this limitation in the language of the guaranty does not mean that in every trial of property there shall be a jury, though dependent on fact. It means that the jury right shall apply only in those matters or instances in which at the date of the adoption of the constitution, the right to demand a jury existed, not in those matters which up to that date fell within the known jurisdiction of equity jurisprudence. Opinion in *Barlow* v. *Daniels*, 25 W. Va. 512; Sedgw. St. & Const. Law, note 486. See note, page 188, to *Steamboat Co.* v. *Roberts*, 48 Am. Dec. 178. This note is a learned and elaborate discussion of the jury right in all its phases. Now, when West Virginia was formed, and when both her Constitutions were adopted, this statute giving equity courts power in partition to pass on legal title was in force, and thus courts of equity at that date exercised this power, and these Constitutions did not abolish it. True, before that statute the Virginia bill of rights of 1776 and the constitution of 1830 contained this guaranty: but the Virginia court in *Pillow* v. *Improvement Co.*, 23 S. E. 32, did not regard that fact as material, but said that as, since the enactment of the statute of 1849, the constitution of 1851 was adopted, and this power was exercised in equity under the act before that constitution, it was not unconstitutional. So, though for more than a century there has not been a moment of time when this guaranty of jury trial was not in our constitutional law, still, as the statute antedates the formation of this state, we can say that, before our Constitution was adopted, it was an acknowledged power of a court of equity. I suppose it enough to say it existed at the adoption of the present Constitution, and

the presence of the jury clause in prior Constitutions is not controlling. For this reason, if for no other, the statute is valid.

Then, construing the statute as above indicated, has this case shelter in a court of equity under the head of partition? I do not think it has. True, as against Settle, Davis shows right to partition; but he brings in Low and the coal company. The bill does show that the plaintiff was entitled to half the tract conveyed by Settle to him, leaving Settle owner of the other, and states in a very obscure way that Low and Settle claim an interest, and that the coal company claims an undivided half, and then states that they may be entitled to Settle's half, and calls on them to say. I suppose, as deriving this half from Settle, they would be tenants in common with Davis, and properly in court for partition, and any kind of controversy as to the right of Low and the company could be settled. Davis would have right to have a partition binding on all, and not a partition binding only on Settle. So far Low and the company are properly parties. But the answer of the coal company repudiates ownership in itself of the land in which Davis has an interest, and claims only as tenant of Low. This ends the matter of partition as to the company, based on the idea that it is co-owner with Davis by right derived from Settle by said deed. The tract conveyed by Settle to the company is a different tract from that claimed by Davis. Davis' bill so asserts. Next as to Low: Low's answer repudiates any ownership derived under Settle, and sets up a right derived by deed from the trustees of Agnes Peyton and Mrs. P. This right in Low gives no part ownership in the Settle land to enable us to say Low owned part, and' Davis part, but, if anything, gives Low the entirety. It has no kinship with Davis' claim further than the two claims are to land originally vested in Sarah Stuart, she having sold fifty acres to Huse, and Huse to Settle, and Settle half of it to Davis; while a large tract came to Mrs. Peyton, as child of Sarah Stuart, and was by her conveyed entirely to Low. It is a hostle claim. There is not a shadow of community of interest between Low and Davis. In truth, the plaintiff's amended bill shows an adverse title. It says that any pretense of claim by the coal company or Low, under

the Peyton deed to Low, to the Settle land, claimed by Davis, is unfounded, because that was excepted from it. Instead of showing, as a partition bill must, a common title, a community of interest, it calls on the company to show its claims, under its deed from Settle, for the land conveyed by Price to Settle, and by him to the Company, or otherwise, and to say whether under or against the Settle title. Its construction as a whole shows no community, but hostility, of interest and claim. The fact of hostile claim by defendant speaks out on reading the bills. The amended bill alleges two actions of ejectment between the two, as hostile titles. What equity exists between Davis and Low or the company? No equity arising out of community of interest. Where two own land, there is an equity between them, giving right to partition. Right to partition pre-supposes a community of interest in the estate, else there is no right to partition. The defendants do not claim as joint owners with plaintiff, nor under any one who was joint owner with him, or with any under whom he claims. With whom were these defendants ever joint owners? There never was a common seisin between them and any one else. They claimed and entered, claiming an entirety.

Though jurisdiction cannot be sustained under partition, can it be sustained under that head of equity jurisdiction exercised to remove cloud over title? The bill is not framed with that view. It is sought to be sustained as a suit for partition, praying only for that, although in all its features and in its entire cast it sets up two hostile claims of title. It does not set up matter to bring it under the jusisdiction of equity to remove cloud from title to realty. It lacks an allegation indispensable to bring it under this head. It does not say that the plaintiff is in possession, and ask the court to remove a cloud, but says the defendant company is in actual possession. Equity will not try conflicting titles to land, unless it is incidental in administering relief, under some known head of equity jurisdiction; and, to bring a suit under the known head of jurisdiction to remove cloud from title, the plaintiff must be in possession, for, if not in possession, he may sue at law in ejectment. That equity will not settle title or bounds of land between adverse claimants is settled by

a multitude of cases. *Stead* v. *Baker*, 13 Gratt. 380; *Stuart* v. *Coalter*, 4 Rand. (Va.) 74; *Lange* v. *Jones*, 5 Leigh, 192; *Hill* v. *Procter*, 10 W. Va. 59; *Cresap* v. *Kemble*, 26 W. Va. 603. Equity has a distinctive jurisdiction to remove cloud from title to land in certain cases, in and of itself, independent of other grounds for jurisdiction. Story, Eq. Jur. §§ 694, 699, 700; 2 Am. & Eng. Enc. Law, 298; *Appeal of Dull*, 113 Pa. St. 510, (6 Atl. 540); 3 Pom. Eq. Jur. § 1398; note to *Helden* v. *Helden* (Md.) 45 Am. St. 374, (31 Atl. 506); *De Camp* v. *Carnahan*, 26 W. Va. 839. That, to give a party jurisdiction in equity based alone on the ground that it is a suit to remove cloud from title, he must be in possession, and the bill so allege, see *Christian* v. *Vance*, 41 W. Va. 754 (24 S. E. 596); *Clayton* v. *Barr*, 34 W. Va. 290 (12 S. E. 704); *Helden* v. *Helden* (Md.) 45 Am. St. 371, 375, (31 Atl. 506), and United States cases just below. The plaintiff's bills show only equitable title in him. Under decisions of the United States Supreme Court, that, too, is a bar against this suit, as one to remove cloud. In *Frost* v. *Spitley*, 121 U. S. 552, (7 Sup. Ct. 1129), Justice Gray, delivering the unanimous opinion of the court, says: "Under the juristion and practice in equity, independently of statute, the object of a bill to remove a cloud upon title, and to quiet the possession of real estate, is to protect the owner of the legal title from being disturbed in his possession, or harassed by suits in regard to that title; and the bill cannot be maintained without clear proof of both possession and legal title in the plaintiff. *Alexander* v. *Pendleton*, 8 Cranch, 462; *Peirsoll* v. *Elliott*, 6 Pet. 95; *Orton* v. *Smith*, 18 How. 263; *Crews* v. *Bercham*, 1 Black, 352; *Ward* v. *Chamberlain*, 2 Black, 430. As observed by Mr. Justice Greer in *Orton* v. *Smith*: 'Those only who have a clear, legal, and equitable title to land, connected with possession, have any right to claim the interference of a court of equity to give them peace, or dissipate a cloud on the title.' 18 How. 265. A person out of possession cannot maintain such a bill, whether his title is legal or equitable; for if his title is legal his remedy at law, by action or ejectment, is plain, adequate, and complete; and, if his title is equitable, he must acquire the legal title, and then bring ejectment. U. S. v. *Wilson*, 118 U. S. 86, (6 Sup. Ct. 991); *Fussell* v.

*Gregg*, 113 U. S. 550, (5 Sup. Ct. 631)." Same in *Allen* v. *Hanks*, 136 U. S. 300, (10 Sup. Ct. 961).

At one time I thought that as the bill alleged no legal title in the plaintiff, and, not being able to maintain ejectment on a merely equitable title, he could sustain this suit as one to remove cloud, though not in possession, being led to that opinion by note to section 1399, 3 Pom. Eq. Jur., and note to *Helden* v. *Helden* (Md.) 45 Am. St. 376, (31 Atl. 506); but more careful investigation has satisfied me that the law is not there correctly stated. The cases they cite will not support their broad statement, though a good many do contain points in their syllabi that are broad and are well calculated to mislead; but, when scrutinized, the cases will be found to be such as to justify equity jurisdiction by some feature falling under known and acknowledged grounds of jurisdiction, as to enforce a trust for title, or cancel a deed procured by fraud, or the like, some equity subsisting between the parties calling for relief in chancery, but that is not the jurisdiction based on the separate, distinct grounds spoken of above, —that is, removal of cloud over title. As I stated above, chancery will not entertain a suit to settle title or bounds of land, unless it is incidental in administering relief under some known head of jurisdiction. But the exception is as well fixed as the rule. Where there is any equity between the parties to give jurisdiction under a legitimate head, it will try land titles, as it will other matters falling in its way in exercising its legitimate jurisdiction. That is nothing but the old rule stated in *Cresap* v. *Kemble*, 26 W. Va. 603, "that equity has no jurisdiction to settle title or boundary of land when the party has no equity against the party holding the land." *Lange* v. *Jones*, 5 Leigh, 192. He must have an equity against the adverse claimant; no one else will do. *Stuart* v. *Coalter*, 4 Rand. (Va.) 79. How, then, can one holding only equitable title get relief against one holding adverse claim in possession? He must get legal title, or sue in the name of those under whom he claims having legal title. Davis had adequate relief by ejectment. He could sue in the name of the heirs of Huse's vendors. I think he could sue in his own name. Why? If the deed from the Peytons to Low did not exclude the Huse land, while it is true the statute did not

run against those who sold to Huse, yet, if they were suing
Settle in ejectment, would not a possession of fifty years
create the presumption of a grant from them, and thus bar
even them? *Hale* v. *Marshall*, 14 Gratt. 489, 494;
*Matthews* v. *Burton*, 17 Gratt. 312. If it would, it would
bar Low, if he sued as a leinee of the Peytons. But if the
deed to Low excepted the Huse land, as it did, then against
Low, a stranger, that great possession would cover the
statutory period five times, and create and vest legal title
in Settle, on which Davis could sue anybody in possession.
That possession *per se* made legal title. *Garrett* v. *Ram-
sey*, 26 W. Va. 345; *Bicknell* v. *Comstock*, 113 U. S. 150, (5
Sup. Ct. 399); 2 Minor, Inst. 492; Hutch. Land Litles, 237,
238. So I conclude there is no jurisdiction in equity.

I fail to see how the coal company's purchase of Settle
can operate to make Low a co-owner with Davis, or give
them a common seisin. The coal company was only Low's
tenant, not his agent to do this act. In this act it was act-
ing only for itself, so far as we know. How is it possible
that its purchase of Settle could operate to suddenly turn
Low from a hostile claimant against both Settle and Davis
into a co-owner with Davis, so as to give equity jurisdic-
tion? If a tenant can thus affect his landlord, merely be-
cause he is tenant, without proof of agency so to do, the
rights of the landlord are at the mercy of the tenant.
We should not presume an authority of such gravity. To
do this is to make Low guilty of fraud in purchasing of
Settle with notice of Davis' rights, and so make Low
a trustee, as if he held title for Davis, when Settle
passed no title to Low, and on this theory erect equity ju-
risdiction. The coal company, taking title, if it had ac-
quired this land from Settle, could be said to be trustee
for Davis, and title be followed into its hands; but why
make a trustee of Low when Settle passed no title to him
to justify jurisdiction in equity to follow title into his
hands? He has nothing to follow. Shall we assume—
merely assume—that the coal company really purchased
for Low's benefit? It amounts to this: You are a hostile
claimant of land, and your adversary sells half to a third
party; and then a tenant on your land buys for himself
the whole land from your adversary, with notice of his sale
to the third party. Instantly, from the mere force of

your tenant's act, you are converted from the character of an adversary to your competitor and his vendee, and are a co-owner with that vendee and a fraudulent purchaser and trustee holding for him; and therefore equity has jurisdiction to entertain the third man's suit for partitition on account of your supposed seisin in common with him, and also because you are purchaser of his rights with notice; and equity will follow the title into the tenant's hand, and take it from him, and take your adverse title, too,—the one you held before your tenant bought your old enemy's title.    I do not realize the force of this position.    This is the basis of equity jurisdiction, as I understand Judge Dent, and not the fact that the claims of all came from a common source, Mrs. Stuart.    It is to be added, however, that Settle did not covey to the coal company this tract, in which Davis has taken an interest, but a separate tract, that conveyed by Price to Settle.    How, then, could even Settle, much less Low, become co-owner with Davis in other land by reason of such conveyance?

If there were no jurisdiction in equity, it would be proper to decide nothing else; but as the majority holds there is, I shall refer to other points raised in the case, in which I understand other members of the Court to concur.

A second point made by appellant's counsel is that the contract between Stuart and Huse is void for uncertainty. But it has been executed and purged of uncertainty by conveyance from Settle to Davis; and a stranger to it cannot set up its uncertainty.    And Low and the coal company, under his right, do not own the land within it, as it was settled in the case of *Low* v. *Settle*, 32 W. Va. 600, (9 S. E. 922), that the deed from Agnes Peyton to Low did not include the land within that contract.    The opinion in that case so states, and because that deed did not include this land, and thus Low had not legal title, a verdict and judgment in his favor were set aside; and so that matter was directly adjudicated, as is logically and unavoidably deducible from the judgment rendered by this Court.

A third point made by appellant's counsel is that the agreement between Davis and Settle is void for champerty. I think it is champertous.    But who sets up its vice?    The coal company, an utter stranger to it.    While Davis could not enforce it against Settle, if Settle resisted, a stranger

cannot set up this defense, as "the taint of champerty only invalidates contracts as between parties to the champerty." 1 Whart. Cont. § 429; *Courtright* v. *Burns*, 13 Fed. 317, and Judge Thompson's elaborate note, page 323; 3 Am. & Eng. Enc. Law, 86. As will be seen in Judge Thompson's note, this old-time doctrine of champerty is discountenanced and obsolete in many states, and its principles are greatly relaxed. While the common law under which it exists yet keeps it alive here, we should certainly not widen its scope, so as to let third parties avail themselves of it. Settle, the only one prejudiced by it, has waived it by conveying, in pursuance of the contract, to Davis. We cannot cancel it now. 2 Pom. Eq. Jur. §§ 929, 936.

A fourth point made by appellant's counsel is that neither the personal nor real representatives of Sarah Stuart or Seth Huse are parties. What matters this to the coal company or Low? They did not own the land to be affected by any back purchase money or want of legal title. No specific performance was being enforced against it, to enable it to call for parties representing the purchase money or title. It was not a suit for specific performance. It was a suit to divide the land between Davis and Settle, and the coal company was made a party, as setting up a title to the whole under Settle, or in some way. I do not see how the matter of whether Settle had paid purchase money to Huse, or Huse to Stuart, or whether legal title was yet in Stuart's heirs, was material to the coal company, from its relation to the case.

Another point made by counsel against the decree is its denial of compensation to the coal company for improvements put on the property. I need here consider this point only as to Davis. Can he be charged with improvements? He cannot. There is no evidence as to improvements. The answer asserts that they were made, and of the value of thirty thousand dollars, but the replication traverses this and thus calls for proof. There is an amended bill, which admits the making of improvements, but for which we could not say there were any. When put there we do not know; but certainly after Davis' contract had been recorded, after the coal company's agent had actual knowledge of it, after this Court had determined that Low, the landlord of the company, had no title to the

land; and it must have been after the commencement of this suit, wholly or largely. Not only had the coal company knowledge of facts sufficient to put it on inquiry as to Davis' right, but had actual notice of it, was not a *bona fide* purchaser as to him, and hence it could not, when it put improvements there, have believed its title good. They were made with eyes open to bad title. So clearly and fully has the law been stated on this subject, that it would be useless to restate it here. Under our decisions no compensation can be given for these improvements. *Hall* v. *Hall*, 80 W. Va., 779 (5 S. E. 260); *Dawson* v. *Grow*, 29 W. Va. 838 (1 S. E. 564); *Cain* v. *Cox*, 29 W. Va. 258 (1 S. E. 298); *McKim* v. *Moody*, 1 Rand. (Va.) 58.

Another point is that Settle and Davis both are estopped from claim by the fact that Settle, under his right to the land sold by Sarah Stuart to Huse, and by Huse to Settle, had surveyed off a certain boundary of fifty acres, and accepted a deed from Mrs. Stuart's executor in satisfaction of his right under the Huse contract, and now cannot claim another tract in addition. We decided in *Low* v. *Settle* that such deed was not an estoppel upon Settle, for want of power in the executor to convey, and danger of the heirs of Mrs. Stuart avoiding the deed, and thus want of mutuality. If this be not *res judicata*, yet the estoppel would operate in favor of the heirs, not Low, as Low has no claim to this land. The coal company's right arose long after this conduct of Settle, alleged as an estoppel *in pais*.

The fifth point made against the decree is that exceptions to depositions were overruled. The exceptions are that no sufficient notice of time and place was given. It is said the state in which Greenbrier and Fayette counties are is not given. Judicial notice is taken that they are in West Virginia. A party ought to be held to know that. I think the service of one notice as to the coal company not good; but the depositions only go to prove that the land involved in this suit is the same involved in the ejectment of *Low* v. *Settle*, and some other matters, alleged in the bill, not denied in the answers, and otherwise than by the depositions appearing. If the depositions be stricken from the record, it would not alter the case. The coal company is the only exceptant. No matter to it that notice was not

given to others. Evidence of Davis and Settle is said not to be competent against Low, because Low is dead. They gave no evidence of any transaction or communication personal with him.

*Reversed in Part and Modified.*