# CHARLESTON.

HARRY S. IRONS, ADMR., ETC., *et al.* v. CROFT HAT & NOTION CO. *et al.*

Submitted September 14, 1920.     Decided September 21, 1920.

1. EQUITY—*Allegation Not Denied is Taken as True.*
     An undenied allegation in a bill in equity is taken as true. (p. 690).

2. CHAMPERTY AND MAINTENANCE—*Defense May be Interposed Only in Action Based Directly on Contract.*
     Maintenance or champerty may be interposed as matter of defense, only in an action or suit based directly on the contract affected by the infirmity of maintenance or champerty. (p. 690).

3. CORPORATIONS—*Agreement Looking to Conversion of Assets and Acquisition of Stock of Another Company Held an Active Trust, Not Contravening Public Policy.*

A trust created by an agreement made in pursuance of a resolution adopted by the stockholders of a corporation and signed by all of its stockholders, authorizing the trustees therein named and provided for, to convert all of the assets of the corporation into shares of the capital stock of another corporation to be formed, by sale or exchange thereof, and to obtain a definite number of such shares, at a fixed price per share, devising ways and means of payment or security themselves, as to any excess of the cost of the shares above the value of the assets, issue trustees certificates reprsenting the shares so to be acquired, to the individual stockholders of the old corporation, in proportion to their respective holdings therein, and hold and vote such new shares for a period of ten years paying to the certificate holders dividends received on the shares in excess of what may be needed for payment of purchase money of the stock, is an active, substantial trust, carrying interests and powers necessary to accomplishment of a lawful and meritorious purpose and does not contravene any principle of public policy. (p. 690).

4. SAME—*Trustee Under Stockholders' Agreement Held Authorized to Pledge Shares of Another Corporation to it to Secure Payment Thereof.*

Under an agreement having such a purpose and conferring such powers and authority and also obligating the certificate holders to indemnify and save harmless the trustees as to expenses, costs, damages and other liabilities arising out of their acceptance of the trust, the trustees have power and authority to pledge the shares so acquired to the issuing corporation, to secure payment of the subscription or purchase price of the stock, or to any other person to secure payment of money borrowed and used in the purchase of stock. (p. 696).

5. SAME—*Preliminary Contract and Resolutions of Directors and Stockholders Held to Determine Terms of Trust Agreement.*

To determine the scope of such an agreement and the extent of the powers conferred upon the trustees by it, general and indefinite terms and clauses therein must be read and interpreted in the light of a preliminary contract it was designed to carry into effect, a resolution adopted by the directors of the corporation, indicating the main features and purpose of the trust agreement and the resolution adopted by the stockholders,

accepting the proposition evidenced by the contract and authorizing preparation and execution of the trust agreement. (p. 696).

6.  SAME—*Under Trust Agreement to Convert Assets and to Purchase Stock of New Corporation, Distributable Assets Defined.*

    Under such an agreement, neither original assets of the corporation, remaining unapplied and unused in payment for the new stock, while indebtedness on account thereof still exists, nor any property subsequently acquired by the trustees, with money borrowed on pledges of such stock, for use in what they deem to be within the scope of their trust, are distributable assets of the old corporation, while the trust remains in full force and effect. (p. 696).

7.  SAME—*Trust Agreement for Conversion of Assets and Acquisition of Stock of Another Corporation Worked a Dissolution.*

    Authorization of such disposition of the assets of a corporation, as is contemplated by such an agreement, by a resolution adopted in a meeting of its stockholders, and distribution of the new stock to be acquired among its stockholders in proportion to their interests, works a dissolution of the corporation; but its corporate name, charter, franchise, officers and powers survive, in so far as use thereof may be necessary to full and complete effectuation of the trust, and may be invoked and used by the trustees for such purpose. (p. 699).

8.  SAME—*After Trust Agreement Pursuant to Resolution of Stockholders Decree of Dissolution Held Merely Declaratory.*

    Under such circumstances, a decree of dissolution of the corporation, subsequently pronounced, is merely declaratory of a status already effected by voluntary corporate action. (p. 701).

(WILLIAMS, PRESIDENT, absent.)

Appeal from Circuit Court, Cabell County.

Suit by Harry S. Irons, administrator, etc., and others against Croft Hat & Notion Company and others. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

*Fitzpatrick, Campbell, Brown & Davis* and *Livezey & Irons,* for appellants.

*George S. Wallace* and *Williams, Scott & Lovett,* for appellees.

. Poffenbarger, Judge:

The general nature of this suit is disclosed by the opinion filed on the disposition of a former appeal in it, which is found in 82 W. Va. 549, under the title, *Williams et al. v. Croft Hat and Notion Co. et al.* After the cause was remanded, Williams died and Harry S. Irons, appointed administrator of his estate, and the other two plaintiffs, A. P. Hudson and H. O. Boette, have prosecuted the suit to a final decree, which sustained the trust agreement attacked by the bill and affirmed the right of the trustees to hold, under and by virtue of that agreement, all of the known assets of the Croft Hat and Notion Company, consisting of 1000 shares of the common stock of the Croft-Stanard Company, 340 shares of its preferred stock, 111 shares of the Miller Supply Co., trustees certificates representing 242 shares of the stock of the Croft-Stanard Company, purchased by the trustees from S. M. Croft, a $1000.00 note of S. M. Croft, purchased from Ed. L. Boggs and some cash and accounts and bills receivable. It dissolved the Croft Hat and Notion Company, on the ground of cessation to do business, and referred the cause to a commissioner for an inquiry and report as to the existence of any assets of the company other than those above indicated. From this fruitless decree the plaintiffs have appealed.

The bill was predicated in part on an allegation that the trust agreement was not executed by Williams, wherefore, by its terms, it never became effective; but this allegation wholly failed. It was clearly proved that he had signed it.

One purpose of the suit is dissolution of the Croft Hat and Notion Company. To maintain such a suit, the plaintiffs must own one-fifth of the capital stock. The Williams estate owns 14 2-3 shares, Boette 15 shares and Hudson claims 183 shares by assignments from J. H. Long, S. M. Croft, the administratrix of Annie E. Croft and Frank P. Swan. These shares admittedly represent more than one-fifth of the capital stock, but Hudson's title is disparaged in argument and by some evidence disclosed in the record. As the answers do not deny his title, but, on the contrary, aver his purchase of the stock at the instance of O. L. Stanard and with his assistance, the allegation of his ownership of the 183 shares must be taken as true

for the purposes of the bill and the suit. *Ihrig* v. *Ihrig,* 78 W. Va. 360.

Taint and contamination of the titles of Boette and Hudson, by reason of alleged maintenance and champerty, constitute another ground of attack upon their claims of right to maintain the suit. Stanard was formerly general manager of the Croft-Stanard Company. For some reason he was ousted from that position and he and his friends do not own enough of the stock of the company to enable them to elect a majority of the directors and thus get the management in their hands. It is charged that the principal object of this suit is dissolution of the trust agreement under which 1000 shares, exactly one-half, are held, in consequence of which these shares would be distributed and some of them fall into the hands of Stanard's friends. He and S. R. Pierson arranged for the purchase of the Croft Hat and Notion Co. stock claimed by Hudson and executed the note by which the money was raised for payment of the purchase price. Hudson is no party to the note and does not seem to have paid any of the purchase money nor to have obligated himself therefor. Stanard and Pierson, associates in business, seem merely to be using his name in this suit. Between Stanard and Boette there is a contract by the terms of which the former is conditionally bound to take over the latter's stock at a certain price, in the event of the success of the suit, and to pay the costs and expenses incident thereto.

Hudson's contracts may be invalid, as between him and the vendors of the stock, under the legal principle known as maintenance, and Boette's contract may be vitiated, as between him and Stanard, by champerty, a form of maintenance; but as the enforcement of these contracts is not the purpose of this suit, their infirmities cannot be invoked by way of defense. None of the defendants is a party to these contracts or either of them. "Strangers to a champertous contract cannot take advantage of it; only a party can do so." *Harrison* v. *Harman,* 85 W. Va. 538, 102 S. E. 224. To the same effect see *Davis* v. *Settle,* 43 W. Va. 17. In some jurisdictions it is otherwise, but our rule seems to accord with the better reason and the weight of authority. 5 Am. & Eng. Ency. L. 834; *Burnes* v. *Scott,* 117 U. S. 591.

If the trust agreement assailed by the bill is valid and invulnerable, there will be no occasion to inquire whether the plaintiffs are estopped, Boette by his own conduct and the others by the conduct of their predecessors in title. As has been stated, the court below has held that it is valid and that the trustees, by virtue thereof and the contract of which it is said to be a part, or an incident, hold all the properties and assets in controversy.

On July 8, 1913, the Croft Hat and Notion Company, a corporation having an authorized capital stock of $200,000.00, of which 977 shares of the par value of $100.00 had been subscribed and paid for, was engaged in a wholesale dry goods business at Huntington, W. Va. On that day S. M. Croft, president of the company, entered into a written agreement with O. L. Stanard, providing for the organization of a new corporation to be known as the Croft-Stanard Company and to have a paid up common capital stock of $200,000, divided into 2,000 shares of the par value of $100.00 each. Croft was to have, for himself and whomsoever he should elect, 1000 shares and Stanard, for himself and friends, the other 1000 shares. Stanard was to convey to the new corporation a certain building at the price of $30,000.00. Croft was to deliver to it all of the assets of the Croft Hat and Notion Co., at prices to be determined by prescribed methods, and the new corporation was to assume all of the liabilities of the old. This agreement was read and discussed in a meeting of the directors of the Croft Hat and Notion Co., held July 12, 1913, and a motion adopted, recommending "the proposition" to the stockholders, and providing that, in the event of its acceptance, "the entire stock holdings of the stockholders of the Croft Hat and Notion Company be vested in a trustee who should issue trustee's certificates to the individual stockholders in proportion" to their stock holdings. At a meeting of the stockholders, held July 26, 1913, "the proposition of re-organization" was presented and "accepted" and an attorney authorized to "prepare a trust agreement for 10 years," to be submitted to the stockholders for signature. The stockholders then selected S. M. Croft, S. B. Robertson

and C. C. Henking as trustees to be named in the trust agreement.

The agreement, as prepared, was not to become effective, unless nor until signed or ratified by all of the stockholders, but it was signed by all of them. By it, they agreed that 1000 shares of the capital stock of the Croft-Stanard Company should be issued to the trustees, to be held by them for their common benefit, and the trustees were to issue to them what are termed "voting trust certificates," entitling them to the beneficial interests of the arrangement, including proportionate shares of dividends to be declared on the shares so held. One of its most important provisions is this: "Said trustees shall in the event that the assets of the Croft Hat & Notion Co. aggregate more than $100,000.00 received from the Croft-Stanard Company the difference between $100,000.00 in stock and the value of said assets in cash and pro rate said cash payment between the stockholders of the said Croft Hat & Notion Company in proportion to their respective holdings of stock in the last named company and in the event that the assets of the said Croft Hat & Notion Company should not equal the sum of $100,000.00, the said trustees are authorized, directed and empowered to execute their note to the Croft-Stanard Company for the difference between the amount of the assets and the Croft Hat & Notion Company and the said sum of $100,000.00 and to receive from it as a consideration therefor, stock in the said Croft-Stanard Company of an equal amount, said stock to be owned by the parties hereto in proportion to their respective holdings and the said note to be paid by the trustees out of the dividends accruing upon the stock of the Croft-Stanard Company and to be *decuted* pro rata from the dividends of the signatories hereto."

After the agreement had been signed, the 1000 shares of the Croft-Stanard Company were issued to the trustees, in consideration of which a note for the par value thereof, $100,000.00, payable to the Croft-Stanard Company, was executed by the Croft Hat and Notion Co., which the trustees did "accept." The inventory of the goods and fixtures of the Croft Hat and Notion Co., made up agreeably to the methods prescribed, amounted to $89,058.18 and its liabilities aggregated $78,398.56. The difference between these amounts, $10,659.62, was credited on the

note.    As security for the balance due on it, nearly $90,000.00, the shares so obtained by the trustees were pledged to the Croft-Stanard Company.    Collections made from accounts and bills receivable of the Croft Hat and Notion Co., and applied on the note, together with $34,000.00 from cash dividends on the new stock, had reduced it, by June 1, 1914, to $47,000.00.    On or about that date, the payee of the note required payment, and the trustees borrowed from two banks and from an individual sufficient funds to take it up, executing their own notes to the new creditors, in most cases, if not all, it seems, and pledging to them shares of the stock as collateral security.    These debts have since been reduced to about $44,500.00.    In the meantime, the Croft-Stanard Company has declared substantial dividends payable in preferred stock, and thus put into the hands of the trustees 340 shares of such stock.    The voting trust certificates they hold, representing 242 shares of Croft-Stanard Company stock, were acquired by purchase from S. M. Croft, and partly paid for by credit for a debt he owed the Croft Hat and Notion Co. and partly in cash.    Croft owed the Croft Hat and Notion Co. a considerable balance on his subscription for 250 shares of its stock, evidenced by a note.    At a meeting of the directors, held August 22, 1916, he offered to sell his certificates representing shares in the Croft-Stanard Company at $90.00 per share, and the board of directors authorized acceptance of his proposition, through a committee appointed for the purpose, and directed delivery thereof, when acquired, to the trustees of the stockholders, to be held by them under the trust agreement.    This committee was further authorized to make "such necessary arrangements as to financing the trade as in their judgment was best," and to purchase and make like disposition of any other certificates of that kind, from time to time, making necessary arrangements to finance such purchases.    Under this authority, they bought Croft's certificates, paying him in cash $11,063.55, the difference between the purchase price and the amount he owed the company, with money borrowed for the purpose and secured by pledges of shares of the Croft-Stanard Company.    For some reason, the trustees purchased a $1,000.00 note of Croft from Ed. L. Boggs.    Another important item of the assets in the hands of the trustees is the stock of the Miller Supply Company, 111

shares.    At the date of the reorganization or transformation of
the Croft Hat and Notion Company, it had discounted at a bank
a note executed to it by Croft for $13,120.00, secured by a pledge
of 100 shares of Miller Supply Company stock, owned by Croft.
After maturity of the note and default, the bank sold the shares
and became the purchaser thereof.    On February 2, 1915 the
trustees, in order to obtain the stock which was worth much more
than the debt, repurchased it from the bank for the amount of
the debt and 7% interest thereon, and, as a further condition,
guaranteed certain other obligations of Croft to the bank,
amounting to about $7,000.00, but these obligations were not
discharged by the trustees.    They were paid in some other way.
The money with which the Miller Supply Co. stock was pur-
chased was raised by loans on Croft-Stanard Company stock.
After it was acquired, declaration of a stock dividend increased
the number of the shares to 111.

In the argument submitted for the appellants, plaintiffs below,
the trust agreement is treated as a simple, dry, voting trust,
placing the legal title to the shares in the hands of the trustees
as mere representatives of the stockholders whose stock they
hold.    Such a trust may be void as contravening public policy
manifested by the statutes governing corporations, but, if it is
such a trust, its validity is argued by counsel for the appellees.
As, in our opinion, it is not such a trust, there is no occasion to
enter upon an inquiry as to the right of stockholders irrevocably
to pool their stock in the hands of trustees for voting purposes.
This agreement is to be read and interpreted and its character
defined, in the light of the contract it was designed to carry into
full execution, the situation of the parties, the circumstances
surrounding them and their own interpretation of it.    By it the
trustees were created and commissioned to accomplish the pur-
poses of the contract between Croft and Stanard, in which the
corporation was substituted for Croft, by the action of himself
and its stockholders, with the assent of Stanard and the Croft-
Stanard Company.    That contract contemplated application
of all of the assets of the Croft Hat and Notion Co. to payment
of the purchase money of the 1000 shares in the new corporation
at their par value.    Full consummation thereof would leave the
old corporation and its stockholders nothing but the stock of

the new corporation, if the assets did not exceed the contract price of the Croft-Stanard Company stock. The status of the old corporation and its assets was such that it was estimated that a period of ten years would be required for full execution thereof. The trustees were expressly authorized to procure the new stock and contract indebtedness in the process of acquirement if necessary, and it was necessary to do so. For the discharge of such indebtedness all of the assets of the old company as well as the stock to be acquired were informally bound. The contract between Croft and Stanard expressly sold and assigned the assets to the new corporation, and the authority conferred upon the trustees, to ceate a debt in the purchase of the stock in the Croft-Stanard Company, at least gave them a lien upon the shares for indemnity against personal liability. In the purchase of the stock upon credit, they strictly pursued the terms of the trust, and to hold that they may not look to the stock and any other assets in their hands for their own protection in the exercise of that power would be a strange and oppressive construction, as well as a deviation from terms of the agreement, expressly binding the *cestui qui trustent* to indemnify the trustees. It would also be at variance with well established principles. "Trustees have an inherent right to be reimbursed all expenses properly incurred in the execution of the trust and no express declaration in the trust instrument is requisite to create that right." Hill, Trustees, 2nd Am. Ed., p. 832, citing many authorities ancient and modern; *Woodard* v. *Wright,* 82 Calif. 202; *Harper's Appeal,* 64 Pa. St. 315; *New* v. *Nicoll,* 73 N. Y. 127, 29 Am. Rep. 111; *Johnson* v. *Leman,* 131 Ill. 609, 19 Am. St. 63 and note. Thus the stock was indirectly bound for the debt made in the purchase thereof on a universally recognized principle. It may be, as held in *New v. Nicoll,* cited, that, having right to advance the money and charge the trust estate, the trustee may bind it to the creditor by an assignment of his lien. If that be true, the trustees rightfully and validly pledged the stock for the purchase money thereof, even upon a strict construction of the instrument under which they acted. But the trust was created for the purposes of the contract between the two corporations. The value of the assets of the old corporation and as much additional money as might be necessary were

to be invested in 1000 shares of another corporation. The trust was an instrumentality devised and agreed upon for effectuation of that purpose. The trustees were not only to hold the stock. They were mandatorily charged with the duty of obtaining it. Paragraph 7 authorized them to do so. Procuration thereof was essential to the interest of all parties. The assets of the old corporation were sold, not for cash, but for stock. To obtain their agreed value it was necessary to get the stock. No limit was placed upon the powers of the trustees as to the method of obtaining it. They were merely authorized to execute their note for the difference between the par value of the new stock and the assets of the old corporation, not required to do so. A reasonable interpretation of the term "assets" as used in paragraph 7 would be that it did not include, for the purpose of immediate credit, the accounts and bills receivable, the value of which were unknown. In the Croft and Stanard preliminary agreement they were dealt with separately. They were to be guaranteed by the old company and bear interest at 3% for a short time and then to be closed by 6% notes, *or otherwise as might be agreeable to the directors of the new company.* This provision of the contract may have precluded right and power in the trustees to compel the Croft-Stanard Company to allow credit for the accounts and bills receivable on the purchase price of the stock. Nowhere in the preliminary agreement is there any obligation to give such credit, nor is it made a condition of the exercise of the power conferred by the trust agreement. It could be imposed only by inference from the use of the word "assets," in the trust agreement, and the Croft-Stanard Company was not a party to that paper. It could stand on the preliminary contract. The trustees were commissioned to obtain the stock and not restricted as to the method of obtaining it, further than to obtain credit on the purchase money for the agreed value of the goods and fixtures, less the liabilities. Beyond this the mode of execution of the power conferred upon them was clearly left to their discretion; and in such cases the donee of a mere naked power may execute it in any manner that will legally effectuate the intention of the donor. *Harrison* v. *Harrison,* 2 Gratt. 1; *Knight* v. *Yarborough,* 4 Rand. 566; *Cowles* v. *Brown,* 4 Call. 477; 31 Cyc. 1115. Still more lati-

tude is allowed in the execution of a power coupled with a trust. *Taylor* v. *Benham,* 5 How. (U. S.) 233; 31 Cyc. 1115. On this branch of the case, we are clearly of the opinion that the trust agreement conferred power upon the trustees to pledge the stock for its purchase money and to repledge it to other parties to procure money with which to pay off the balance due on the original note; and that they hold the stock for their own indemnity against personal liability and for their creditors in a representative capacity, as well as for the stockholders of the old corporation. Having such title, they are more than mere trustees in a voting trust of corporate stock, wherefore the agreement does not violate the alleged principle of public policy invoked against it, if there is such a principle.

The provision of paragraph 12 of the trust agreement, inhibiting sale, transfer and assignment of the stock by the trustees, is not irreconcilably inconsistent with this interpretation. It must be read in subordination to the general purpose and the power conferred upon the trustees by paragraph 7. The stock had to be obtained before the trust could be consummated. The agreement was prospective. Sale, transfer and assignment of owned and unencumbered stock is inhibited, but the stockholders did not then have this stock in that form nor in any other, but the trustees were authorized to procure it for them, unrestrictedly as to the method of acquirement, except in one or two particulars. Plainly they had power to assign it as security for its own purchase money. This provision may nevertheless have important operation, and it is only necessary to give it a reasonable function to perform. The trustees likely cannot sell the stock for the purpose of terminating the trust.

This conclusion fully dispenses with the second ground of attack upon the trust agreement, namely, that it is incapable of execution for lack of authority in the trustees to borrow money and pledge the stock as security. Obviously they did have such authority.

The contention that the agreement is void because the Croft-Stanard Company stock is the property of the Croft Hat and Notion Company and has not been disposed by corporate action, is not well founded. Action in meeting may be essential

to the validity of the action of stockholders, but, in this instance, the stockholders so acted.     The directors in meeting recommended acceptance of the plan and purposes outlined in the preliminary agreement and suggested the trust agreement. Then the stockholders in meeting accepted and adopted both, named the trustees and directed preparation of the trust agreement, which, in its main features, agrees with the suggestion made by the directors.     In the minutes of these meetings, there is lack of detail and formality, but nevertheless, they furnish conclusive evidence of intention to turn the Croft-Stanard Co. stock over to the trustees and stockholders when purchased.

Whether, on dissolution of the corporation, which has been decreed, all of the property in the hands of the trustees, other than the Croft-Stanard Company stock, the trust agreement being valid, depends upon the status of such other property. Some of it is not in terms covered by the trust agreement.     All of it except the old accounts and bills receivable uncollected was purchased by the trustees, with money borrowed by them.     The accounts and bills receivable were dedicated by the Croft and Stanard agreement to the purchase of the Croft-Stanard Company stock; but, owing to their uncertain value, they could not be directly applied.     More than $44,000.00 of that purchase money remains unpaid, but is not due to the original creditor.     The trust agreement authorized the use of the assets of the old corporation in the purchase of the stock and its main purpose was effectuation of the aim and design of the Croft and Stanard preliminary contract.     Hence the right of the trustees to have the accounts and bills receivable applied on their debt is clear, from what has been said concerning the character and scope of the trust.   ' The Miller Supply Company stock first came into the hands of the Croft Hat and Notion Co. as collateral security for S. M. Croft's note for $13,120.00, which was discounted to the Huntington Banking and Trust Company.     At the time of the sale thereof for default in payment of the note and its purchase by the bank, it was worth considerably more than the debt, and the difference between its value and the debt was regarded as an asset of the Croft Hat and Notion Co.     If it had made the sale and purchase thereof, it would have had that advantage.     Hence, it was, in a sense an

86 W. Va.

asset of the Croft Hat and Notion Co., which the trustees thought they had power and authority to conserve and ultimately use for the purposes of the trust with the other assets. By their purchase thereof from the bank, they did conserve it and it is now a valuable asset which may be required and used in payment of the indebtedness of the trust estate. The trust certificates acquired from Croft occupy a similar position. Croft owed the Croft Hat and Notion Company about $9,000.00 or $10,000.00, the debt being evidenced by his note with which his stock was deposited as collateral. In August, 1916, the trustees, on the recommendation of the directors of the company, bought his certificates, representing 242 shares, at $90.00 per share, paying him the difference between his indebtedness and the purchase price of the shares, something more than $11,000.00. Here again, the trustees were conserving one of the assets of the company. If, however, in these two instances they exceed their authority as trustees, but acted as the agents of the Croft Hat and Notion Company, independently of the trust agreement, that company has neither a legal nor an equitable right absolutely to demand distribution of these securities, for it furnished none of the purchase money beyond the value of assets used in the transactions, and what it did so furnish the trustees have the right to apply on the debt made in the purchase of the Croft-Stanard Co. stock. If they acted as its agents or trustees, under a new and distinct authority, and it wants to avail itself of the profits in the transactions, it must reimburse them or other creditors for the money borrowed and expended in the acquisition of these profits, and its stockholders stand on no higher ground than it occupies. Its directors authorized the trustees to purchase the Croft certificates. Presumptively, the directors knew they had purchased the Miller Supply Company stock, for some or all of them were directors and acting professedly for its benefit, not against it nor in their own interests, and it has acquiesced in their action. Since that transaction, there has been both a directors meeting and a stockholders meeting, without complaint or protest. This long silence with full knowledge strongly argues ratification. One of these transactions having been expressly authorized and the other ratified, these purchases, if made on behalf of the com-

pany, are valid, but it does not follow that the stock and certificates involved in them must be disturbed. They are bound for the debts made by the agents or trustees in the purchaser thereof. All of the Miller Supply Company stock is directly pledged for some of these debts. The trustees' certificates are not, but, as the agents or trustees paid for them with borrowed money, except in so far as they were paid for by the Croft note, they are entitled to hold them until they or other persons furnishing the money are reimbursed. They cannot be withdrawn for distribution among stockholders or even to pay corporate debts, without payment of what they cost. If they are corporate assets so held, the corporation has an equity in them, of course, and, on dissolution, the stockholders can require liquidation of these transactions and take what remains after payment of the debts.

But they are not the property of the corporation at all nor in any sense. It never paid a dollar for them, nor pledged any securities or other property for them. After the execution of the trust agreement, authorized by its stockholders, by resolution adopted in meeting, and vested authority in the trustees to use all of its assets in the purchase of Croft-Stanard Company stock, to be held by the trustees for the stockholders, it had no free assets nor property of any kind. The trust agreement and the peliminary and attendant transactions left the corporation nothing but its name, charter, franchise and organization. For all practical purposes, it was dissolved and went out of business. All it had was directly and indirectly distributed to its stockholders, then and there. It was kept alive only as a basis for distribution of the new stock and for the use of its name in proceedings and transactions necessary to final and complete consummation of the scheme adopted for winding it up and distribution of its assets on the basis fixed by the trust agreement. The plan or scheme adopted by the stockholders provided for payment of all of its debts. They were assumed and paid by the Croft-Stanard Company, pursuant to the terms of the preliminary contract and the resolution adopted by the stockholders, after the execution of the trust agreement. The trustees were authorized to apply all of its assets to payment of purchase money of the Croft-Stanard Co. stock, and that stock was, by

the authorized trust agreement, distributed among the stock-holders. The trust agreement itself authorized the trustees to receive any excess of value of assets above the cost of the stock and distribute it among the stockholders. From this procedure, intention of the stockholders to discontinue the business of the corporation arises by necessary implication and that amounts in law to dissolution of the corporation. *Law* v. *Rich.* 47 W. Va. 634. They adopted a resolution authorizing the doing of what, when done, discontinued the business and distributed the net assets. Continued use of the name and organization signifies nothing. It involved no more, in law or fact, than execution of the winding up scheme. Ordinary business was never resumed. Meetings of stockholders and directors were held, in some in-stances, merely to advise the trustees to whom the work of con-version of the assets into stock had been delegated. The trus-tees had the right to use the corporate name, officers and pow-ers as far as necessary. After dissolution, the name of a cor-poration and its corporate powers still continue for such pur-poses. *Miller* v. *Newberg Orrel Coal Co.*, 31 W. Va. 836; *Greenrbier Lumber Co.* v. *Ward*, 30 W. Va. 43; *Donnally* v. *Hearndon*, 41 W. Va. 519; *Hall* v. *Bank*, 14 W. Va. 584; Code, Ch. 53, sec. 59. Aside from this process of winding up the old corporation, and applying its assets to the purchase of the new stock, the trustees represented the stockholders as individuals and, subject to the rights and powers of the trustees, the new stock belongs to them as individuals and not to the corporation. Whatever the shares may be in form, they are legally distributed assets of the old corporation, held by the trustees for the stock-holders.

The task thus imposed upon the trustees has not been fully performed nor has the time allowed them for performance, by the terms of the trust agreement, expired. The trust can be terminated prior to the expiration of the period of ten years by a majority vote of its beneficiaries, but their willingness to term-inate it has not been so expressed, nor at all. All of the prop-erty in controversy either belongs to the assets of the corporation which the trustees have the right to apply on the indebtedness, or has been purchased by the trustees and is held either under the trust or in their individual capacities, under the trust, if the

purchases were authorized; in their individual capacities, if purchased without authority.          In the former case distribution must await termination of the trust.          In the latter case, the beneficiaries ratify the unauthorized transactions, if they claim the benefit thereof, and thus bring them under the trust.          If there has been an abuse of authority or action in excess of authority, the beneficiaries have remedies, of course; but such abuse or action alone confers upon them no right to call for sale or distribution of these assets upon any theory set up in their bill or amended bills.

The decree of dissolution of the Croft Hat and Notion Company is merely declaratory of what had already been effected by voluntary action of the stockholders, wherefore the cross-assignment of error is not well taken.

The decree will be affirmed.

*Affirmed.*